# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL WEIGELE, TESSA BISHOP, JOSE VALLADARES<br><br>                              Plaintiff,<br><br>     vs.<br><br>FEDEX GROUND PACKAGE SYSTEM, INC.; et al.<br><br>                              Defendants. | CASE NO. 06-CV-1330-JLS (POR)<br><br>**ORDER: GRANTING DEFENDANT'S MOTION TO DECERTIFY**<br><br>(Doc. Nos. 210, 211, 212, 214) |

Presently before the Court are Defendant' motions to decertify classes 2, 3, 4, and 5.[1] (Doc. Nos. 210 (2(c) & 5(c) Decert.), 211 (2(a) & 5(a) Decert.), 212 (2(b) & 5(b) Decert.), & 214 (3 & 4 Decert.) Plaintiffs have filed an omnibus opposition. (Doc. No. 231.) Defendant has filed four reply briefs. (Doc. Nos. 240–43.) After full consideration of this matter, the Court **GRANTS** Defendants motions to decertify.

## BACKGROUND

This Court's Certification Order described the relevant factual background. As such, it is repeated here in relevant part.

---

[1] Defendant filed four motions for partial decertification, but three of them are almost word-for-word identical. Although Defendant may prosecute its case as it chooses, it must do so within reasonable bounds. Defendant **SHALL NOT** waste the Court's time with duplicative motions that could easily be consolidated. Future conduct of this sort will result in sanctions.

- 1 -                                                                 06cv1330

> Defendant FedEx ("FedEx") operates a ground package delivery system throughout the United States. Plaintiffs, former FedEx managers, allege that Defendants improperly classified them as exempt from overtime pay because they spent the majority of their time conducting non-managerial (non-exempt) tasks, including package handling. Plaintiffs also argue that since they were in fact non-exempt employees, they were improperly denied meal and rest breaks during their tenure.
>
> FedEx's operations involve unloading inbound packages, sorting, moving to outbound docks and ports, and loading onto vans and trailers for delivery. There are two divisions at FedEx: the Ground Division, consisting of Satellite and Hub facilities, and the Home Delivery division, which are either stand-alone facilities, or are co-located with Ground Division Satellites.
>
> At both Ground Satellite and Ground Hub facilities there are Senior Managers who are in charge of the entire operation. There are also Sort Managers that serve as assistant managers for the Senior Manager. Next, there are Dock Service Managers, that serve essentially as assistants to the Sort Mangers, and work directly with hourly-paid Package Handler employees. At the Home Delivery facilities, there are no Sort Managers, but there are Dock Service Managers that report directly to the Senior Managers.
>
> As of March 2005, FedEx handled 2.66 million packages per day and had grown 16% year over year. Given this large volume, Defendants have created standardized policies, procedures, standards, manuals, task lists, work flow processes and engineering for many of the elements of their operation. For example, Defendants have created training manuals on handling packages, loading vans, increasing production and handling time cards. Defendants have conducted studies on their operations that have concluded "Too much of our management's time is spent loading" and "Focus is to free up Managers from loading." Defendants have also uniformly classified management positions, including . . . Dock Service Managers, as exempt from overtime compensation.
>
> Plaintiffs allege that due to corporate's productivity goals, understaffing, tight hourly budgets allocated towards package handlers, high turnover of hourly employees, absenteeism, and equipment failures, their primary duty was package handling–a non-exempt activity. Plaintiffs also allege that they were forced to miss meal and rest breaks in violation of California law.

(Doc. No. 111 (Certification Order) at 1–3.)

At present, four classes remain in this matter, all brought on behalf of Defendant's California-based Dock Service Managers.[2] First, Class 2 advances overtime claims. This class is divided into three subclasses: (a) "hub" facility Dock Service Managers; (b) "satellite" facility Dock Service Managers; and (c) "home delivery" facility Dock Service Managers. (First Amended Complaint (FAC) ¶¶ 24–25.) Class 3 involves claims that the class members were not provided a 30-minute uninterrupted meal period. (*Id.* ¶ 24.) Class 4 seeks recovery for failure to provide two 10-minute rest breaks. (*Id.*) Finally, Class 5 seeks recovery of "waiting time penalties." This class includes identical subclasses to Class 2. (*Id.* ¶¶ 24–25.)

---

[2] Plaintiffs voluntarily dismissed a fifth class, known as Class 1, of Sort Managers.

## LEGAL STANDARDS

**I.   MOTION TO DECERTIFY**

"A district court's order respecting class certification is 'inherently tentative' prior to final judgment on the merits." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 633 (9th Cir. 1982); see also Fed. R. Civ. P. 23(c)(1)(C). Thus, if the Court determines that a class was not properly certified it may modify or decertify that class. *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982).

In reviewing whether certification remains proper, the Court again applies the requirements of Federal Rule of Civil Procedure 23. *O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 410 (C.D. Cal. 2000). That is, the classes must meet all four requirements set forth in Rule 23(a) and at least one subdivision of Rule 23(b).

The moving party bears the burden of demonstrating that class certification is no longer proper. *Gonzales v. Arrow Fin. Servs. LLC*, 489 F.Supp.2d 1140, 1153 (S.D. Cal. 2007); *Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 651 (C.D. Cal. 2000). However, the decision on whether to decertify lies within the Court's sound discretion. *Knight v. Kenai Peninsula Borough Sch. Dist.*, 131 F.3d 807, 816 (9th Cir. 1997).

In deciding this motion, the Court "is bound to take the substantive allegations of the complaint as true." *Blackie v Barrack*, 524 F.2d 891, 901 n.17 (9th Cir. 1975). Nonetheless, the Court may "consider evidence which goes to the requirements of Rule 23 even though the evidence may also relate to the underlying merits of the case." *Hanon v Dataproducts Corp.*, 976 F 2d 497, 509 (9th Cir 1992). However, weighing of competing evidence is inappropriate. *Wang v. Chinese Daily News, Inc.*, 231 F.R.D. 602, 605 (C.D. Cal. 2005) (citing *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003)) (abrogated on other grounds by *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935 (9th Cir. 2009)).

**II.   CALIFORNIA OVERTIME LAWS**

California's overtime law is codified in California Labor Code section 510.

> Eight hours of labor constitutes a day's work. Any work in excess of eight hours in one workday and any work in excess of 40 hours in any one workweek and the first eight hours worked on the seventh day of work in any one workweek shall be compensated at the rate of no less than one and one-half times the regular rate of pay

> for an employee. Any work in excess of 12 hours in one day shall be compensated at the rate of no less than twice the regular rate of pay for an employee. In addition, any work in excess of eight hours on any seventh day of a workweek shall be compensated at the rate of no less than twice the regular rate of pay of an employee.

Cal. Lab. Code § 510(a); *see also* Cal. Lab. Code § 500 (defining, *inter alia*, "workday," "day," and "workweek").

### III.  CALIFORNIA MEAL & REST PERIOD REQUIREMENTS

Similarly, California law precludes an employer from "employ[ing] any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes, except that when a work period of not more than six (6) hours will complete the day's work the meal period may be waived by mutual consent of the employer and the employee." Cal. Code Regs. tit. 8, § 11070(11)(A). "If an employer fails to provide an employee a meal period in accordance with the applicable provisions of this order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the meal period is not provided." *Id.* § 11070(11)(D).

As for rest periods, "[e]very employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof. However, a rest period need not be authorized for employees whose total daily work time is less than three and one-half (3 1/2) hours. Authorized rest period time shall be counted as hours worked for which there shall be no deduction from wages." *Id.* § 11070(12)(A). "If an employer fails to provide an employee a rest period in accordance with the applicable provisions of this order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each work day that the rest period is not provided." *Id.* § 11070(12)(B).

### IV.  WAITING TIME PENALTIES UNDER CALIFORNIA LAW

Labor Code section 203 imposes waiting time penalties on employers. That is, "If an employer willfully fails to pay . . . any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days." Cal. Labor

Code § 203.

## V. CALIFORNIA'S EXECUTIVE EXEMPTION

An employee may qualify for an "executive exemption" from California's overtime and meal and rest period laws. An employee classified as "exempt" is not covered by California's overtime and meal and rest period laws. If a classification is challenged, the employer bears the burden of demonstrating that its classification is correct. *Ramirez v. Yosemite Water Co.*, 20 Cal.4th 785, 794–95 (1999). In order to qualify for this exemption, the employee must meet six criteria. First, the employee's "duties and responsibilities [must] involve the management of the enterprise." Cal. Code Regs. tit. 8, § 11070(1)(A)(1)(a). Second, he must "customarily and regularly directs the work of two or more other employees." *Id.* § 11070(1)(A)(1)(b). Third, the employee must have "the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight." *Id.* § 11070(1)(A)(1)(c). Fourth, the employee must "customarily and regularly exercise[] discretion and independent judgment." *Id.* § 11070(1)(A)(1)(d). Fifth, the employee must be "primarily engaged in duties which meet the test of the exemption." *Id.* § 11070(1)(A)(1)(e). And sixth, the "employee must also earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment." *Id.* § 11070(1)(A)(1)(f).

## PRIOR ORDER

The Certification Order in this case engages in all of the inquiries set forth by Rule 23. Beginning with those in Rule 23(a), the Order first notes that the proposed class involved more than 500 members. The Court concluded that these classes were sufficiently numerous to make joinder impracticable. (Certification Order at 5.) Next, the Court found that there were some common issues of law and fact, making a commonality finding appropriate. (*Id.* at 5–7.) The Court also found that the named Plaintiff[3] was sufficiently typical because he "allege[d] a similar injury, similar violations, and possesses the same interests as the putative class members." (*Id.* at 7–8.) Finally, the Order stated that Plaintiff could fairly and adequately protec the interests of the class. (*Id.* at 8.) Given these four

---

[3] At the time of the Certification Order only the only named Plaintiff was Michael Wiegele. (*See* Doc. Nos. 198 & 208.)

findings, that Court determined that Rule 23(a)'s requirements were met.

Next, the Order discussed the three prongs of Rule 23(b). It first rejected the application of Rule 23(b)(1). (*Id.* at 9.) This was because "this case is best characterized as primarily a suit for money damages" and because "Plaintiffs ha[d] not shown that . . . a limited fund exists" or that "Defendants' ability to pay members of the putative class [was] limited." (*Id.*) Moreover, "several courts . . . ha[d] found certification of [wage and hour] disputes inappropriate under Rule 23(b)(1)." (*Id.*) Proceeding to Rule 23(b)(2), the Court held that subsection 2 was also not a proper basis for classification. (*Id.* at 10.) The reason for this, as with subsection 2, was that "Mr. Wiegele and each of the Plaintiffs' declarants are former employees that cannot benefit from prospective injunctive relief" and that "plaintiffs' primary interest is monetary relief." (*Id.*)

On Rule 23(b)(3), however, the Court found certification appropriate. (*See id.* at 10–17.) It began by holding that common questions predominate over individual issues. (*Id.* at 11–16.) This was because of the consonance between several of the common questions identified by Plaintiff and those determinative of predominance in other cases. (*See id.* at 12.) By far, the most significant[4] among these common issues was that "Defendants treat Managers as a class by uniformly classifying them as exempt, regardless of [where] they work." (*Id.*) As such, the Court noted that "'[i]t is manifestly disingenuous for a company to treat a class of employees as a homogenous group for the purposes of internal policies and compensation, and then assert that the same group is too diverse for class treatment in overtime litigation.'" (*Id.* at 13 (quoting *In re Wells Fargo* (*Wells Fargo I*), 2007 WL 3045995, at *11 (N.D. Cal. 2007)).) Although the managers performed different duties, the Court concluded that common issues predominated because "Plaintiffs [were] challenging Defendants' *policy* of classifying all managers as exempt." (*Id.* at 15.)

As to the superiority issue, the Court discussed the additional cost in time and expense were this action pursued individually. It concluded the large number of workers impacted justified a finding that class treatment was superior. Thus, having concluded that Plaintiff had satisfied the requirements of Rule 23(a) and (b)(3) the Court granted Plaintiff's motion for class certification.

---

[4] Although the Court never directly stated that uniform classification was the most important consideration, it was far and away the dominant subject of this Court's predominance analysis.

- 6 -                                                        06cv1330

**DISCUSSION**

In making its motions, Defendant ignores the requirements of Rule 23(a) in favor of arguing about Rule 23(b)(3). Rule 23(b)(3) permits a class action where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, **and** that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3) (emphasis added) Both elements of this rule are required in order for certification to be proper. However, in light of changes since the Court's Certification Order, it finds that neither element is satisfied.

**I.     THE PREDOMINANCE REQUIREMENT**

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. v. Windsor*, 521 U.S. 591, 623 (1997). "In contrast to Rule 23(a)(2), Rule 23(b)(3) focuses on the relationship between the common and individual issues." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998). "'When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis.'" *Id.* (citation omitted). Put another way, the question is whether issues "'subject to generalized proof . . . predominate over those issues that are subject only to individualized proof.'" *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001) (abrogated on other grounds by statute) (quoting *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228 1233 (11th Cir. 2000)).

"Because no precise test can determine whether common issues predominate, the Court must pragmatically assess the entire action and the issues involved." *Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 489 (E.D. Cal. 2006). "Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). "Whether judicial economy will be served in a particular case turns on close scrutiny of 'the relationship between the common and individual issues.'" *In re Wells Fargo Home Mortgage Overtime Pay Litig.* (*Wells Fargo II*), 571 F.3d 953, 958 (9th Cir. 2009) (quoting *Hanlon*, 150 F.3d at 1022).

Additionally, since the Class Certification Order the Ninth Circuit has provided additional guidance especially relevant to this case. In *In re Wells Fargo Home Mortgage Overtime Pay Litig.*, 571 F.3d 953 (9th Cir. 2009), and *Vinole v. Countrywide Home Loans, Inc.*, the Ninth Circuit addressed how a district court is to engage the predominance inquiry when "an employer uniformly classifies a group of employees as exempt" as is the case here. *Vinole*, 571 F.3d at 945; *see also Wells Fargo II*, 571 F.3d at 957.

The Circuit found that an exemption policy such as Defendant's is relevant to the commonality issue. "An internal policy that treats all employees alike for exemption purposes suggests that the employer believes some degree of homogeneity exists among the employees. This undercuts later arguments that the employees are too diverse for uniform treatment." *Wells Fargo II*, 571 F.3d at 957. "[U]niform corporate policies will often bear heavily on questions of predominance and superiority. Indeed, courts have long found that comprehensive uniform policies detailing the job duties and responsibilities of employees carry great weight for certification purposes. Such centralized rules, to the extent they reflect the realities of the workplace, suggest a uniformity among employees that is susceptible to common proof." *Id.* at 958–59 (citation omitted).

However, "a district court abuses its discretion in relying on an internal uniform exemption policy to the near exclusion of other factors relevant to the predominance inquiry." *Vinole*, 571 F.3d at 946. "A uniform exemption policy . . . has no . . . transformative power. Whether such a policy is in place or not, courts must still ask where the individual employees actually spent their time. As one court succinctly explained, '[t]he fact that an employer classifies all or most of a particular class of employees as exempt does not eliminate the need to make a factual determination as to whether class members are actually performing similar duties.'" *Wells Fargo II*, 571 F.3d at 959 (quoting *Campbell v. PricewaterhouseCoopers, LLP*, 253 F.R.D. 586, 603 (E.D. Cal. 2008)).

Thus, the Court must "assess[] . . . the relationship between individual and common issues" to determine whether the common issues predominate over individual issues. *Vinole*, 571 F.3d at 946. It must "take[] into consideration all factors that militate in favor of, or against, class certification." *Id.* And the "overarching focus remains whether trial by class representation would further the goals of efficiency and judicial economy." *Id.* (citing *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001)).

### A. Classes Two and Five

As noted above, classes two and five make claims regarding the Defendant's failure to pay overtime and waiting time penalties. Defendant, as it has previously, argues that the Dock Service Managers' day-to-day jobs vary so widely that individual issues predominate. Although Defendant addresses the various subclasses separately, the Court deals with them together here because they present nearly identical issues.

Defendant believes that all of the Dock Service Managers do their jobs differently. (2(a) & 5(a) Decert. at 3–4.) It cites to declarations, depositions, and a survey which indicate that the time any particular manager spends on any particular task is subject to significant variance. (*Id.* at 4.) It depends on how he or she chooses to manage.

Defendant also asserts that the common classification of Dock Service Managers as "exempt" is not sufficient to demonstrate predominance. (*Id.* at 16–22.) The Ninth Circuit made this clear in both *Wells Fargo I* and *Vinole*, rejecting a line of cases relied upon by this Court in its Certification Order. Extending this point, Defendant argues that Plaintiffs lack common evidence that they were misclassified. (*Id.* at 16–18.) There are no policies stating how the Dock Service Managers should do their jobs or evidence of uniform work duties. (*Id.*) Nor, according to Defendants, is there common evidence regarding the class members' discretion. (*Id.* at 20–22.) Thus, misclassification is largely an individual issue. Since this is the primary issue in this case, Defendant reasons that common issues cannot predominate.

Plaintiffs argue that there are numerous common questions of fact involved in this case. In fact, they cite the Certification Order's references to standard practices, studies, policies (and lack thereof), and other factors in its decision to certify the Class. (Opp. at 15–16 (citing Certification Order at 12–13).) They also rely heavily on Defendant's standardized practices such as standardized training, (*id.*, Ex. 6) and standardized work processes. (*Id.*, Exs. 7–13.) According to Plaintiffs, the processes at FedEx's facilities are highly engineered and Defendant has set targets for the number of packages moved per direct labor hour. (Opp. at 8.) And, although the assertion is unsupported, Plaintiffs claim that Defendant's policies "requir[ed]" Dock Service Managers "to handle packages and make up any slack." (*Id.* at 21.) Plaintiff says that these standards are consistent across Satellite, Hub, and Home Delivery facilities. (*Id.* at 10.)

1  They suggest that these policies show that Dock Service managers perform a finite set of uniform duties. (*Id.* at 13.) While acknowledging that each manager's day is somewhat different, Plaintiffs claim that these variances are insufficient to establish that individual questions predominate. (*Id.* at 14–15.) They cite to Defendant's survey evidence for the proposition that the managers' activities are relatively standard, especially when the outliers are eliminated. (*Id.* at 25–26.) Thus, testimony from a randomly chosen sample of the class will result in a reasonable approximation of liability. Further, because FedEx's uniform operations are set above the heads of the Dock Service Managers, they have little discretion. (*Id.* at 11–12.) Plaintiffs also present deposition testimony that indicates that the managers had little opportunity to exercise judgment. (*Id.* at 23–25.)

Finally, Plaintiffs' argue that predominance is strongly supported by the uniform exempt classification. (*See id.* at 20–21.) Echoing the Court's certification order, Plaintiffs claim that it is "disingenuous" for Defendant to classify all Dock Sort Managers in a uniform manner and then claim that they are too diverse to justify class treatment. (*Id.*) They point out that Defendant had no compliance program to ensure that their employees were actually exempt and argue that the standard policies combined with understaffing, turnover, and chronic absenteeism led to an inevitable requirement of performing non-exempt work. (*Id.* at 8.)

Having reviewed these arguments, it is clear that common issues do not predominate. The core issue in the Court's inquiry is California's "executive exemption" from the overtime laws. This is because Defendant will be required to establish that the Dock Service Managers were correctly classified. *Ramirez*, 20 Cal.4th at 794–95.

There are some common issues in this case. Dock Service Managers performed a finite set of tasks. And the parties agree that Defendant provided its managers with standardized training, created standard work processes for tasks, and set expectations regarding performance. Also suggesting commonality is that Defendants uniformly classified these managers as exempt.

Nonetheless, these common issues do not predominate over the individual issues. There are two primary reasons for this conclusion. First, the majority of the issues involved in this matter require individual determinations. In order for the Court to find that an employee is "exempt," that employee must meet six criteria. Among these criteria is the determination of the employee's duties, that is, what tasks an employee performs. Plaintiffs' expert identifies several hundred distinct tasks

which allegedly make up the universe of a Dock Service Manager's duties. (*See* Bradford Decl., Ex. Y (First Krosnick Report) at 35–60.) This massive number of tasks will make it difficult to extrapolate from the testimony of a few managers to the experiences of the whole class.

Moreover, the managers' actual work experiences make clear that this is an individual issue. As Defendants point out, the amount of time any particular manager spent in any particular area varies greatly. (*See, e.g.*, 2(a) & 5(a) Decert. at 5 & 6.) The differences between managers appear to be as little as ten percent to as much as seventy six percent. (*Id.* at 6.) Even taking Plaintiffs' version of these numbers, there is still significant variability. (*See* Opp. at 25–26.) That version suggests that a manager's day may vary by twenty percent from that of an average manager when looking at how much time is spent on a particular task. (*Id.*) But twenty percent variability *per task type* indicates that this is an individual rather than common issue. And this issue carries significant weight because it appears to be the dominant evidentiary factor in resolving Plaintiffs' claims.

The Court's second reason its finding that common issues do not predominate is that with the substantially decreased importance of Defendant's common classification scheme, the common issues are a relatively minor portion of this litigation. For example, Defendant's lack of policies regarding meal and rest breaks or overtime does little to assist in a common determination of whether any particular employee is exempt.

Similarly, Defendant's common processes and training are not overwhelmingly supportive of a finding that common issues predominate. For example, the training materials provide instruction regarding the tasks a Dock Service Manager would perform. (*See, e.g.*, Opp., Ex. 10.) This guidance, however, does not appear to instruct the Plaintiffs to perform non-exempt tasks and would provide no help to the Court in determining the actual work mix performed by the Plaintiffs. (*Id.*) The common processes are similar, speaking to the small details of particular tasks but not how managers were to balance their responsibilities. (*See, e.g.*, *Id.*, Ex. 12.) Nor has the Court been able to find anything in these documents which instructed the Plaintiffs to do a clearly non-exempt task, such as package handling. And to the extent Plaintiffs performed indirect work as a consequence of the strictures of Defendant's policies, that is an individual issue because it requires inquiry into situations inherently specific to the particular Dock Service Manager.

Plaintiffs proffer cases which certified wage and hour claims, but they do not change this

conclusion. For example, Plaintiffs rely heavily on *Tierno v. Rite Aid Corp.*, 2006 WL 2535056 (N.D. Cal. 2006), which certified a class of store managers at the defendant's drugstore chain. *Id.* at *1. However, factual differences, such as the scope of the relevant policies and the defendant's close supervision of the plaintiffs, lead the Court to conclude that it should not follow *Tierno*.

Plaintiffs also cite to *Sav-on Drug Stores, Inc. v. Superior Court*, 96 P.3d 194 (Cal. 2004). (*See, e.g.*, Opp. at 13.) In *Sav-on*, the California Supreme Court considered whether a trial court had abused its discretion in certifying a class of managers' claims to overtime and other compensation. *Sav-on*, 96 P.3d at 199. It found that the trial court had not abused its discretion because "substantial, if disputed, evidence" supported the court's conclusion. *Id.* at 201. However, in that case "[t]he record contain[ed] substantial evidence suggesting that the predominant issue in dispute is how the various tasks . . . should be classified-as exempt or nonexempt." *Id.* at 202. In this case, the Court is persuaded that the predominant issue is determining how the Plaintiffs spent their time. Moreover, the Sav-on court described the task list as "finite" and "definite." *Id.* Although the task list here is literally finite, it is so extensive as to make the value of its finitude questionable. Finally, it is worth noting that *Sav-on* involved an abuse of discretion review, rather than a *de novo* inquiry into whether to certify the class. *Id.* at 199. The court even hinted that the trial court would not necessarily have abused its discretion in denying certification. *Id.* at 203. In light of these issues, *Sav-on* does not change the Court's perspective on certification.

Nor is the Court swayed by Plaintiffs' other cases. Regardless, "determining whether common questions 'predominate' requires a pragmatic assessment of the entire case and the issues involved." *Tierno*, 2006 WL 2535056, at *10. As such, even to the extent that these cases are similar, the Court's pragmatic assessment of the issues in this case lead it the conclusion that individual issues predominate.

B.  Classes Three and Four

Classes three and four are plaintiffs' claim for failure to provide meal and rest breaks. And, their maintenance as a class action turns on the same issues determinative of certification in Class Two and Class Five. As Plaintiffs note, it will prevail on these classes "[t]o whatever extent the trier of fact determines that [Dock Service Managers] are non-exempt." (Opp. at 30.) Since this Court has already found that the determination of exempt status is laden with inherently individual issues, it also finds

that individual issues predominate on the meal and rest break classes.

## II. THE SUPERIORITY REQUIREMENT

The second half of the Rule 23(b)(3) inquiry requires the Court to determine whether class treatment is "superior." To do so, the Court considers Rule 23(b)(3)'s four factors. *See Zinser v. Accufix Research Ins., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001). Those factors are: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). "'A consideration of these factors requires the court to focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis.'" *Zinser*, 253 F.3d at 1190 (quoting 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1780 at 562 (2d ed.1986)). Courts have also noted that "[a] class action is the superior method for managing litigation if no realistic alternative exists." *Valentino*, 97 F.3d at 1234–35. Ultimately, the court has "broad discretion" when deciding whether class treatment is superior. *Kamm v. Cal. City Dev. Co.*, 509 F.2d 205, 210 (9th Cir. 1975).

As with the predominance inquiry, there are factors which militate for and against class treatment of Plaintiffs' claims. As the Court stated in its Certification Order, "it would be far more costly and time consuming for each individual putative class member to seek and compel discovery of Defendants' policies and procedures, take multiple depositions, retain experts, and litigate damages issues." (Cert. Order at 17.) This observation remains true today and cuts in favor of a superiority finding.

The Court, however, must also consider trial management concerns. Defendant argues that given all of the individual issues that must be litigated in this matter, trial administration would be overwhelming. (*See* 2(a) & 5(a) Decert. at 22.) And having reviewed the parties submissions, the Court agrees with this general proposition.

"Plaintiffs' trial methodology envisions calling an entirely manageable random sample of subclass members in a short trial. It will then be up to the trier of fact to determine if FedEx has met

1  its burden to establish its affirmative defense of exempt classification of the [Dock Service Managers]
2  and if so, whether Plaintiffs' evidence establishes liability to all or a portion of the non-testifying
3  subclass members." (Opp. at 2.) Plaintiffs, however, do not offer any estimate of how many class
4  members make up "an entirely manageable random sample." Instead, they suggest that the Court
5  "should consider the quality, not merely quantity, of the representative testimony." (*Id.* at 39.) "The
6  quantity of trial witnesses will thus vary according to the quality of their testimony, and the testimony
7  of a relatively small subset of the class will sometimes be enough to find liability." (*Id.*)

8  Plaintiffs' plan depends largely on the expert report of Dr. Jon Krosnick, Frederic O. Glover
9  Professor in Humanities and Social Sciences at Stanford University. (First Krosnick Report at 13.)
10 According to Plaintiffs, Dr. Krosnick's reports "set out statistical guidelines for the trier of fact to
11 consider as to the representative testimony the parties adduce at trial." (Opp. at 28 (emphasis
12 omitted).) They plan to offer Dr. Krosnick's testimony "as to the ranges of statistical validity for
13 extrapolating to the entire subclass a random sample of representative subclass members of whatever
14 size selected by Plaintiffs." (Opp. at 2.) To that end, Dr. Krosnick's first report contains an exhibit
15 with charts documenting the number of class members who must testify in order to achieve specific
16 confidence levels and margins of error given a particular percent of exempt managers. (*See* First
17 Krosnick Report, Ex. J.) These range from two class members on the low end to 239 on the high end.
18 (*Id.*)

19 The major problem with this proposal is that it would likely require a large number of
20 testifying witnesses and no clear or easy manner of determining liability. According to Dr. Krosnick's
21 calculations, to achieve 95% confidence in a finding with only a 5% margin of error, Plaintiffs would
22 need to present at least 101 Satellite Managers, 79 Hub Managers, and 47 Home Delivery Managers.
23 (*Id.*) These numbers could, potentially, be higher depending on the percentage of exempt Dock
24 Service Managers. (*Id.*) This would be far too many witnesses for a manageable class action.

25 On the other hand, should Plaintiff elect to call less witnesses, they will present the Court with
26 a situation where it cannot be certain regarding the accuracy of conclusions drawn from the witnesses'
27 testimony. Certainly there is no rule requiring Plaintiff to prove its case at a 95% level of confidence
28 with a 5% margin of error. However, as the level of confidence decreases, it becomes increasingly
problematic to rely on the results of sampling to extrapolate out to the whole class. More concerning

are variations in the margin of error, which could leave the jury with a potential 50% range within which the actual number of exempt Dock Service Managers might fall. In effect, Plaintiffs' plan requires too many testifying witnesses at appropriate levels of confidence, but reducing the number of witnesses undermines their ability to reasonably extrapolate to the non-testifying class members.[5]

Moreover, the Court is unclear how a jury will be able to sort out the issues placed before it. It appears that they will need to determine whether each testifying witness was or was not exempt and determine to what extent that witness was not provided with mandated overtime, meal, and rest breaks. They will then need to extrapolate from all of the testifying witnesses to the entire class. But it is unclear which the tools they will have to perform that extrapolation. At worst it appears that they would be left to guess. This is too amorphous to expect a reasonable and rational result from any jury.

In light of the logistical difficulties and uncertainty that would arise by virtue of trying this matter in the manner proposed by Plaintiffs, the Court cannot conclude that class treatment is superior. Certainly denying certification eliminates some efficiencies of class treatment. However, the substantial difficulties introduced by Plaintiffs' proposed trial methodology effectively negate these efficiencies and make class treatment inferior to individual actions. Thus, the Court finds that neither element of Rule 23(b)(3) is met and this case should be decertified.

## CONCLUSION

For the reasons stated, Defendant's motion to decertify is **GRANTED**. Consequently Plaintiffs' motion to strike and Defendant's three motions for partial summary judgment are **DENIED AS MOOT**. (Doc. No. 259, 248, 249, & 250.)

IT IS SO ORDERED.

DATED: April 5, 2010

*Janis L. Sammartino*
Honorable Janis L. Sammartino
United States District Judge

---

[5] This is not to say that there is some "arbitrary minimum" number of class members who must testify in this matter. But enough must testify to allow reasonable and rational conclusions to be drawn from the evidence.

- 15 -                                                                                          06cv1330